Robertson, J.
The objections to the title arose wholly from the instrument of March, 1857, executed by Mr. Lord, coupled with the alienage of Mr. Watt, and they all hinge upon the right acquired by the latter under it.
The extent of the right acquired by Watt in or over the premises in question by such instrument may be narrowed by ascertaining what it does not confer. It does not profess to give, by itself, any right to the possession of the land, or any interest therein, to any one, without the execution of some other instrument by the covenantor; indeed there are no words of present grant in it. Not only is no present right conferred by it on any one, but it does not purport to create any interest, estate or trust in, or power or authority over the land, in any person, or even to give any one the power of creating such estate, interest or trust. Its language is entirely future and executory; it does not *186 make any use of the previously recited purchase for the benefit of Watt as the basis of any equitable estate or interest, but contains only covenants to convey to his appointees. Such covenants contained in it do not run with the land; they affect neither the title to it nor' the mode of using it or its appurtenances; nor do they subject any other land to the use of the owner of the premises in question. In fine, the covenants composing the entire instrument are only executory stipulations, the remedy for whose breach is an action for damages, or their enforcement, if capable of specific performance. The rights of Watt or his assignees are, therefore, wholly in action, not in possession. It is not a covenant to stand seised, for want of the proper considerations of blood or marriage; and it is no form of grant or conveyance recognized or created by any statute.
Although the covenantor, by such instrument, covenanted to allow Watt and his agent to demise the land and receive its rents, and to dispose of it and receive the proceeds of such disposition, it did not confer any right of possession without the execution of some other instrument, even if it passed the right to the rents, in case any demise was made that gave no such right of possession. Neither Watt nor any grantor of his could have legally entered on such land without the permission of the covenantor, or brought an, action of trespass against him for ejecting them, or against strangers for trespassing on it. Watt or bis appointees were not entitled, by the execution of such instrument, to such possession of the land, or the receipt of the rents and profits, as to make his or their right or interest a legal estate within the meaning of the statute. (1 R. S., 727, 5th ed., §§ 47, 48, 49.) Nor was there such a grant of an absolute right of disposition by it, to Watt, as to take the title out of the covenantor and vest it in the latter; it required another instrument to do so. (1 R. S., 733, 5th ed., § 103.) Appointees of Watt had no other remedy to obtain a title or possession of the land, if refused by the covenantor, except to commence an action to compel him to *187 convey the land to them as equitable assignees of Watt. If they had, that, such a right is only a chose in action, not an interest in the land. Mo purchaser from Mr. Lord, with full notice of such a claim, could be affected by it, until the commencement of such action and filing notice of its pendency.
If this be the correct view of the instrument in question, the objection of alienage also falls to the ground; not that I am disposed to consider the conveyance to Lord a mere mortgage, because he bought the property for the benefit of Watt, who, under the covenant in the instrument of March, 1857, was entitled to the proceeds of the sales of all the laud, whether they exceeded or fell short of the debts originally due to him ; and there was no equity of redemption left in any one after he had received the amount of such debt, certainly not in the original mortgagor. Still there was no such interest of Watt in the land as could be forfeited; and if any interpretation could save it from that fate, that must be given to the instrument of 1857.
Forfeiture for alienism retains its feudal character. As long as there is a native owner of the land there can be no forfeiture for the alienism of any one who has right only by contract. Tips principle pervades modern decisions, so that if an alien has no interest in, or control over the soil itself, but only a right to its proceeds whenever it passes by sale to the hands of another citizen or subject, while the right of conversion without the consent of the alien continually exists, neither the fee of the land nor any less estate can be made the subject of escheat by reason of such alienage. (Du Hourmelin v. Sheldon, 1 Beav., 79 ; S. C., on appeal, 4 Myl. & Cr., 525.) Land, over which an alien has no other control except to compel its lease or conversion into personal estate, so far as regards forfeiture for such alienage, is looked upon as already converted into personalty, whether such right arises from conveyance, (Anstice v. Brown, 6 Paige, 448,) or devise, (Meakings v. Cromwell, 1 Seld., 136.)
*188 So, too, if the instrument be such as I have considered it to be, its mere record Avas not notice to any one; (1 R. S., 762, §§ 70, 71 ;) it might have been so, if it were the grant of a power over the land, (1 R. S., 735, § 127,) but it is not even that, and is not in any manner an instrument affecting the title to land, as that language is used in the statute. A glance at the purpose of the recording acts and. the provisions contained in them for carrying it out will readily show this. It is not every document in writing which may have some effect in establishing or overthrowing a title to land, which can be recorded. The written admission of a fact by a party claiming an interest in lands may materially impair Ms right or title, but even if it were under seal, its record would be no notice to purchasers. (Jackson v. Richards, 6 Cow., 617.) It is only the record of an instrument which directly operates on the land itself, and thus affects the title to it, which is notice of the interest, power, trust or estate thereby created. Still less than any other admission would one of facts merely evidence, or tending to create evidence, of the existence of an instrument material to a title, be notice of the existence of such instrument. The record must contain all the knoAvledge Avith which a purchaser is chargeable: his information is not to be derived partly from the record, partly from inquiries outside. Where the law gives the privilege of notifying the world by a copy of an instrument, it must be an exact copy. It is upon these principles that separate records are provided for mortgages, (which are mere liens, capable of being discharged,) executory contracts of sale and powers of attorney, because they do not affect the title to land, although they are the means by which it may be affected. The right, therefore, of which a record is notice is only such as is conferred by the recorded instrument, and is to be determined by its face alone, not by extrinsic evidence, and is not to be a mere claim. Executory contracts and powers of attorney are recorded separately, because they confer no rights in the land; the former are even subject to all equitable defenses which may prevent the enforcement of *189 the obligation contained in them, although arising from facts not apparent on their face; and, the party in whose favor they are made having a right to elect to sue to recover damages for non-performance instead of demanding a specific performance, the title to the land consequently may never be affected by them. The object of the statute was not to embarrass the vendibility of land, by allowing a cloud upon the title to land, which might never become an interest in it, although a mere chose in action, to appear upon record, but simply to preserve evidence of the interest of a person in land, although he might be out of possession. A person having an executory contract for the sale or conveyance of land may convert his right under it into an interest in the land, by commencing an action for specific performance and filing a notice of the pendency of it: it becomes then an inchoate right, the completion of which by the final decree relates back to such inception. As there was no definition or settlement of Watt’s interest under the instrument of March, 1857, except by the record of that instrument, the plaintiff would have had his title discharged of any notice by Watt of his interest.
I think, therefore, the rights of Watt, under the instrument of March, 1857, were not such as to subject the title derived from Mr. Lord, to any claim from appointees of the former, or the State, by reason of his alienage; and that the record of that instrument was no notice of such rights. The title proposed was, therefore, unobjectionable, so far as any objection was raised thereto.
The judgment, therefore, must be affirmed, with costs.
Hoffman, J.
I shall first consider this case upon the assumption that the covenant of the 4th of March, 1857, was executed by Mr. Lord contemporaneously with the deed from the sheriff to him, viz., the 29th of June, 1854; that Mr. Lord did not pay the consideration money to the sheriff in point of fact, some arrangement by receipts having been made; and that the record of the instrument of the 4th of March, 1857, treated as made on the 29th of *190 June, 1854, was an instrument to be recorded—was recorded—and thus became equivalent to notice from the date of the record.
Then I find that James Watt, Jr., the alien, had been the holder of certain bonds and mortgages upon lands in Hew York; that a foreclosure of such mortgages had taken place; that the property was bought in by the agent of Watt, in the name of Daniel Lord, for the ultimate benefit of Watt, in part payment of the amounts due upon such bonds and mortgages; and that deeds had been executed in pursuance of such arrangement, and for such purposes, by the sheriff to said Lord. The lands were taken in order to realize for Watt, the amounts due on the bonds and mortgages which affected the lands.
Then the instrument, to fulfill these objects and carry out these intentions, provides: That the agents of Watt, his heirs, &c., shall be allowed to let and demise the land, and receive the rents thereof, keeping the said Lord harmless; that the latter will convey the lands “whenever requested by Watt, his executors or administrators, to any person or persons by him or them designated;” that, when requested by Watt, his heirs, &c., he will execute deeds, (for sales made,) by the agents or representatives of Watt, his heirs, &c., and allow them to receive the proceeds thereof.
By the 2d section of title 5, chap. 1, part 2 of the Revised Statutes, (1 R. S., 948,) in the construction of every instrument creating or conveying, or authorizing the creation or conveyance of any estate or interest in lands, it shall be the duty of courts of justice to carry into effect the intent of the parties, so far as such intent can be collected from the whole instrument, and is consistent with the rules of law.
With the intention of this instrument to benefit Watt by getting payment of the amounts due on the mortgages, held steadily in view, we are to examine these various provisions.
A naked authority to the agents of Watt to let the *191 lands, and receive the rents, limited to what is necessary for the purpose designed, is not equivalent to vesting in Watt a title to the actual possession of the lands, as well as to an indefinite receipt of rents and profits. (1 R. S., 727, §§ 47-49.)
A mere, and probably revocable power to a class of persons, to let the property and take the rents, falls much short of the case made by these sections.
There is next the delegation of a power to Watt, to designate a person or persons to whom Lord shall convey the land. This clause is the most difficult of all the clauses to make consistent with the general scope and intent of the instrument, as I have suggested it to be. But I am of opinion that it can be justly read to mean only this: That to carry out the general purposes, if circumstances occurred which rendered a change of the grantee advisable, Watt should have the power to do so; and the substituted person or persons should stand precisely in Mr. Lord’s place.
The last clause is, in substance, that Watt’s agents or representatives may make sales of the land, and Lord will execute deeds to the proposed purchasers, and will account for the proceeds, or allow such agents to receive them. Thus' I interpret this provision. This appears to be of itself, nothing but an agreement to sell the lands, through a class of agents, and account for the proceeds, but to throw light upon and aid in the construction of the other clauses.
Thus the case is brought, in my judgment, within the principle of Anstice v. Brown, (6 Paige, 448 ;) of Craig v. Leslie, (3 Wheat., 563 ;) and Meakings v. Cromwell, (1 Seld., 136,) Watt was to take the rents, and the proceeds of sales of lands, in and towards the discharge of the amounts due on the bonds and mortgages, which he originally held as security for a debt due to him.
Du Hourmelin v. Sheldon, (4 Milne & Craig, 525,) is a very pertinent and very instructive case irpon this subject.
*192 There is another view of the ease. Suppose the Sheriff’s deed had been to Mr. Lord to hold the premises upon the trusts therein after expressed, and then the provisions of the instrument had severally been prefaced by a statement, “upon trust” and “upon further trust”—What would have been the legal operation?
Eor reasons before noticed, I do not think that the 47th and 49th sections of the statute affect the case. The 51st and 52d sections are inapplicable, because the 53d, I apprehend, applies; but chiefly because, where there is an express declaration of the trusts or conditions on which the land is held, there can be no implied or resulting trust. (6 Paige, 448.) If the 55th section can apply to the case, if it could be thought that it is a trust to sell land for the benefit of creditors, or to satisfy a charge, there would be an end of all difficulty. But I assume, and, probably, it is the true conclusion, that it cannot be thus considered. The 56th and 57th sections do not apply.
Thus then the estate had not become vested in Watt; there was no resulting trust in him. There was no express valid trust within the section allowing such. The legal estate thus far stood unaffected. Nor can I conceive that there was a power in trust in Mr. Lord under section 58. If this conclusion is correct, then in whom did the lands remain subject to the execution of the trust as a power under section 59? It could be nowhere but in the original piortgagors. But he did not grant the power. (§ 74.) Neither Watt nor the sheriff ever had the title.
But is it a mere power in Mr. Lord? Powers are abolished, except as created-, construed and executed under the provisions of article III. (1 R. S., 732.) A power can only exist, can only come from an owner of land, granting or reserving the power to do something which he himself could lawfully perform. It is an act in relation to lands. (§§ 73-75.) No one made Mr. Lord the grantee of a power. No one capable of attaining some interest in the land, created a power in him.
*193 Uses and trusts, except as authorized by the Revised Statutes, being abolished (§ 45,) and powers existing only under the provisions of those statutes; and there being here no trust, no trust power, and no mere power placed or vested in Mr. Lord, the title, to the land remained unaffected by the instrument of March, 1857, either at law or in equity. It becomes a mere covenant which Watt might have enforced, or obtained damages for its violation. It is an instance of the difference between an equitable interest and an equitable or a legal estate, frequently pointed out by Mr. Locklin. (Analogy between Equitable and Legal Estates, passim.) The conveyance by Mr. Lord to a l)ona fide purchaser, even with full knowledge of the instrument, would transfer a good title, and supersede the covenant in favor of Watt, or any act under it.
But if his request ought to be made, then it appears from the stipulation of counsel, that it was made on the 26th of December; after the day of performance, it is true, viz., the 15th, but before action brought. This would be enough, if properly made before suit brought. It would be enough at the hearing, whatever might be the effect on the question of costs. But my view is, :that the instrument created only an obligation to do the act, and did not prescribe the request as a condition precedent to the validity of a sale or conveyance.
There is another and interesting aspect of this case. Adopting the views that the absolute legal title was in Mr. Lord, unaffected by a legal trust, and that there was no limitation of any legal or equitable estate .in Watt, was there not a power granted by Lord to Watt, by force of the instrument of March, and what was the extent and effect of such .power ?
Here again we are to 'be guided by the statute. It is apparent that there is nothing in the paper which authorizes any alienation by Watt. There is no authority to him to alien, in fee or otherwise, by means of a conveyance, will or charge. Ho absolute power of disposition is given to him. (§§ 76-78, 81-83.) The purchase and conveyance *194 must be derived Bom Mr. Lord. There is no power within any provision of the statute which gives Watt an estate, or of itself binds or affects the estate. He has merely a covenant which enables him, to some extent, to control Mr. Lord’s acts and transfers of the property—when to sell and convey.
My brother Bobertsor has, I think, fully shown that the instrument signed by Mr. Lord was not within the recording act. (2 R. S., 762, § 39.) There is also no evidence of actual notice of its existence, either in Ward, the grantee of Lord, or in Bleakie, the grantee of Ward. If the purchaserwas in possession, and defending his title, the ignorance of his grantor would be a sufficient defense, but it seems to me that even then, knowledge should have been a fact to which evidence should have been given in the cause. But the plaintiff here is in this situation, that without anything in the pleadings, or in the case, to call for evidence to such a matter, and seeking to prevent the title being forced upon him, be is to depend upon the want of notice in a party, when it may hereafter be clearly established. I am not satisfied that his protection is clear on this ground. Bor reasons before stated the judgment must be affirmed.
Affirmance ordered; in which Bosworth, Ch. J., concurred.