### FALVEY v. BRIDGES.

*(Supreme Court, General Term, First Department. October 16, 1891.)*

1. SPECIFIC PERFORMANCE—CONTRACT—MARKETABLE TITLE.
   Land sold under foreclosure of a mortgage was purchased for the benefit of W., and the purchaser executed an agreement wherein he covenanted to allow W. and his representatives to let the land and receive the rents, to convey the premises on W.'s request to whomsoever he designated, and to execute deeds on sales made by W., and allow him to receive the proceeds thereof. *Held*, that whatever objection to a title conveyed by such purchaser might exist by reason of this instrument is removed by an instrument executed by W., and reciting that he "had requested and doth request" such purchaser "to sell, and convey the lands already conveyed or to be hereafter conveyed," and that title is sufficient to support a suit for specific performances.

2. SAME—ADVERSE POSSESSION.
   In a suit for a specific performance of a contract to buy land it is no objection to the validity of plaintiff's title that a part of the lot—in the city of New York—was the bed of a Dutch road, where there is evidence that the same had been discontinued by the city, and one under whom he claims had for more than 20 years been in possession under a deed from the city.

Appeal from special term, New York county.

Action by James Falvey against Francis J. Bridges. From a judgment recovered by plaintiff on trial before the court, defendant appeals.

Agued before VAN BRUNT, P. J., and DANIELS, J.

*Frank Schaeffler*, for appellant. *Arnoux, Ritch & Woodford*, for respondent.

DANIELS, J. The object of the action was the specific performance of a contract made on the 12th of March, 1889, between the plaintiff and the defendant, for the sale and conveyance of a parcel of land situated on the north side of 111th street in the city of New York, commencing 285 feet easterly from the north-easterly corner of that street and Fifth avenue, and being 100 feet and 11 inches in depth to the center of the block, and 25 feet in width. The purchase price of the lot was $8,500, $250 of which was payable at the

time of the execution of the contract, and was in fact paid by the defendant to the plaintiff. On or about the 12th of April, 1889, at the place mentioned in the contract, a deed of the lot was tendered by the plaintiff to the defendant, which he refused to accept on account of alleged defects in the title to the lot. It had in part been purchased under the foreclosure of a mortgage by Daniel Lord, and objections were made to the sufficiency of the affidavits upon which an order for the publication of the summons was made, and under which the summons and complaint were served upon Smith T. Wyant, one of the defendants in the foreclosure suit; but this defect was clearly rectified by a deed which Wyant and his wife afterwards executed and delivered to Robert H. Blakie, who at that time had acquired the residue of the title to the property, and that deed sufficiently obviated the objection in this manner taken to the title to require it to be overruled as it was at the trial. When Lord purchased the property on the foreclosure, it was really for the benefit of James Watt, of Dundee, in Scotland, and after receiving the sheriff's deed of the property Lord executed to Watt an agreement by which it was covenanted that the said Daniel Lord will allow the agents, from time to time, of the said James Watt, his heirs, executors, administrators, and assigns, to let and demise the said lands, and to receive the rents thereof, keeping him harmless; that the said Daniel Lord will, whenever requested by the said James Watt, his executors or administrators, convey the said premises, or any portion thereof, to any person or persons by him designated or them; and that, whenever requested by the said James Watt, his heirs, executors, administrators, or assigns, he will execute deeds on sale by the agents or representatives of him, the said James Watt, his heirs, executors, administrators, or assigns, and allow them to receive the proceeds thereof, he being therein indemnified, in which deeds his wife shall unite to her dower, the said James Watt, his heirs, executors, and administrators and assigns, bearing all the expenses thereof. This covenant has been objected to as creating a trust in favor of Watt, constituting a defect in or incumbrance upon the title; but the effect of this agreement or covenant was considered in *Ludlow* v. *Van Ness*, 8 Bosw. 178, where it was held by the court to create neither a trust nor any interest whatever in the estate, and that Lord consequently could, with the assent of Watt, convey the title to the premises. It was further proved in this case, which was no part of the evidence in the action just referred to, that Watt, on the 18th of November, 1856, by his authorized attorney, declared "that the said James Watt had requested and doth request the said Daniel Lord to sell and convey the said lands already conveyed, or to be hereafter conveyed, to be applied to the realizing and satisfying of the amounts due to the said James Watt," which in its effect was a confirmation of what Lord had previously done, as well as should afterwards do, in the conveyance and transfer of the title to the property; and that necessarily removed all ground of objection to the title dependent upon the instrument or declaration previously executed by Lord.

The further and more important objection in the case was placed upon the existence of what has been called the "Old Harlem Road," extending certainly from McGown's pass to the village of Harlem. When this road was first provided for is left quite indefinite by the evidence in the case, but there is at least a probability that it originated in the action of the Dutch authorities having control over Manhattan island prior to their capitulation to the English in the year 1664. This road crossed the block in question in a diagonal direction, and its bed formed a part of the lot of land now in controversy. Whether it was laid out subject to the title of the adjacent owners in the land, or the title to the land itself was taken for the road, does not appear in the case, and for its disposition it probably is unimportant that it should so appear; for by the Dongan charter, which was given on the 22d of April, 1686, all and every of the streets, lanes, highways, and alleys within

the said city of New York and Manhattan island aforesaid were given, granted, ratified, and confirmed to the mayor, aldermen, and commonalty of the city, for their public use and service, (Kent's Charter, etc., 14, 15;) and they remained vested in the city, subject to that use, certainly until the passage of chapter 115 of the Laws of 1807; and, as this highway or road had been laid out and opened prior to that time, it was subject to this grant of authority; and by section 4 of this act the commissioners named in it were authorized "to shut up, or direct to be shut up, any streets, or parts thereof, which have been heretofore laid out and not accepted by the common council of the said city." The evidence did not prove the fact to be that this street or road had been accepted by the common council of the city, and the commissioners were accordingly authorized to close it under this authority. An additional authority was given by chapter 213 of the Laws of 1818 to close any road, street, lane, or alley, or any part thereof, of the city, by conforming to the proceedings provided for in this act; and it was proved by the evidence of Joseph Murray as a witness that this street or road had been discontinued prior to the time when he obtained a conveyance in form of a part of the property. His conveyance included all that part of this road or highway within the bounds of this lot, except that which, by a conveyance from the city of New York on the 16th of November, 1863, in terms conveyed the residue of so much of the road as was included within the bounds of the lot. His testimony was that at the time he bought the lot, which was on the 4th of April, 1869, he had heard of the Old Harlem road, but did not know it was open. He then added: "I could not say how long it was discontinued, but it was for years, to my knowledge, because I moved up to Harlem after I came home from the war, in 1865 or 1866." The correctness of this evidence was accepted by the court, and it seems to have been sufficient to support the conclusion which was adopted that this road had ceased to be traveled as such certainly for upwards of the period of six years; and by section 1, c. 311, Laws 1861, that was sufficient to extinguish it as a highway, for this was a country road, and not a street of the city, within the decision of *In re Lexington Ave.*, 29 Hun, 303. Neither was it the case of an encroachment or obstruction of the road, which was held to be insufficient to work its discontinuance as a highway in *Driggs* v. *Phillips*, 103 N. Y. 77, 8 N. E. Rep. 514. That the road had been discontinued by the authority of the city under one or the other of these acts is to be inferred from the conveyance of the 16th of November, 1863, by the mayor, etc., to Robert Smith, for that in form quitclaimed and released to him a part of the land included within the bounds of this lot, which formed a portion of the Old Harlem road; and it is to be presumed that the public authorities of the city would not have executed such a deed until after they had legally closed this highway for public uses. After Murray obtained his title to so much of the lot as was included within the bounds of the Old Harlem road, he erected a building upon it, commencing it and going into possession about the time his deed bore date, which was at least twenty years and a month prior to the time of the commencement of this action, and twenty years and eight days prior to the tender of the deed to the defendant; and his testimony is that, after taking the deed, he paid the taxes upon the property to the city, and the fact has been so found by the court. It was also further proved, by the production of a map made on the opening of 111th street from Eighth avenue to the Harlem river, that Daniel Lord was assessed for the opening of such street, and damages were awarded to him in the sum of $32, and upon this map the Old Harlem road did not appear to be at the time existing. Other proceedings were taken the year before, of a similar nature, for the opening and extension of Madison avenue from 86th to 120th street. And upon that map these premises were assessed for the sum of $400 for benefits to Daniel Lord, and the map in no way showed the existence of this road. These are very cogent circumstances

indicating the fact to be that the city had closed this road years before Murray received his deed, and under which an adverse possession was maintained, and precluded the city from asserting any title on its' part to any portion of the land in controversy; and that the road could be discontinued under its authority is fully sustained by what was determined in *Amsbey* v. *Hinds*, 46 Barb. 623, and 48 N. Y. 57. The inference is very plain that under one or the other of these acts, if not under all of them, the city had concluded to abandon and close this road, and to provide, as it did, for the convenient use and enjoyment of the property over which it previously passed by these streets, laid out and established between the different blocks of land as they were described by the map produced upon the trial. But if the city could not, on account of its ownership of the bed of the road, close up and discontinue it, then the land in controversy was the property of the adjacent owners, and reverted to them on the discontinuance of the street. In deeds which were given at different times, affecting the title to this land and bounded by or upon the Harlem road, the understanding was disclosed that the title of the adjacent owners extended to the center, and, if they were right in that respect, then when the road was closed and discontinued the title of these owners became complete, and free from the easement previously existing in favor of the public; and, in either event, the plaintiff, who had acquired all the rights of the other parties under their conveyances, as well as under the possession maintained by Murray, obtained the title to the property. If it was subject afterwards to any contingency whatever, it was only to the possibility that the city might still claim to be the owner of so much of the bed of this street as was not included in its own conveyance to Robert Smith. But, after taxing all this property as private, instead of public, property, and assessing it for damages, and according to it pecuniary benefits on account of public improvements, that possibility is so remote as to be worthy of no consideration in the way of impairing the absolute title of the plaintiff to this land, and the judgment which has been recovered was accordingly right, and it should be affirmed, with costs.

VAN BRUNT, P. J., concurs in result.